UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CR 22-358 JRT/JFD

| | |
|---|---|
| UNITED STATES OF AMERICA, | **INDICTMENT** |
| Plaintiff, | |
| | 18 U.S.C. § 1341 |
| v. | 18 U.S.C. § 1956 |
| GAYLE JOYCE FERNGREN, | |
| Defendant. | |

The UNITED STATES GRAND JURY charges:

At times material to this Indictment:

1. Defendant GAYLE JOYCE FERNGREN was a resident of Rush City, Minnesota.

2. FERNGREN participated in a scheme to launder proceeds that were fraudulently obtained from victims throughout the United States, including the proceeds of romance fraud scams and schemes to defraud Federal Pandemic Assistance Programs. After receiving the fraudulent proceeds, FERNGREN kept a portion for herself and transmitted most of the funds to other scheme participants, including to individuals located overseas. In all, FERNGREN laundered at least $1.8 million in fraud proceeds.

### A. *Background on Federal Pandemic Assistance Programs*

3. The federal and state unemployment system for providing federal benefits to eligible unemployed American workers, known as unemployment insurance, ("UI"), has historically been administered through the states' respective workforce agencies, such as California's Employment Development Department

SCANNED
DEC 20 2022
U.S. DISTRICT COURT MPLS

("EDD") and Nevada's Department of Employment, Training, and Rehabilitation ("DETR"). Beginning in or about March 2020 and continuing through in or about September 2021, the federal government provided significant supplemental and expanded UI to offset the negative impacts of the COVID-19 pandemic on the American workforce. As part of the application process, UI claimants were required to provide, among other things, true and correct information and to certify their eligibility to receive UI from a certain state. The state agencies relied upon the information provided by UI claimants in determining eligibility for UI benefits.

4. One way in which some states provided UI benefits to claimants, such as California's EDD and Nevada's DETR, was through the use of Bank of America-issued debit cards that were mailed through the U.S. Postal Service to claimants at the addresses provided in the UI claims. After claimants received their Bank of America debit cards, they could activate it online or over the phone and could use the card to withdraw cash and pay expenses.

5. An additional source of funding authorized by federal law in 2020 and 2021 to combat the negative economic impacts of the COVID-19 pandemic was the authorization of loans administered by the United States Small Business Administration to eligible small businesses referred to as the Paycheck Protection Program ("PPP"). To obtain a PPP loan, small business applicants were required to provide, among other things, true and correct information about their payroll and to certify their eligibility to receive a PPP loan, all of which was used to calculate the

amount of money the small business was eligible to receive. The loan proceeds were required to be used on certain permissible business expenses, including payroll costs.

### B. *Fraud involving Romance Scams*

6. A "romance scam" is a type of fraud that targets persons looking for romantic partners or friendship on dating websites and other social media platforms. Romance scammers may create profiles using fictitious or fake names, locations, images, and personas, allowing the scammers to cultivate relationships with prospective romance scam victims. Under false and fraudulent pretenses, victims may be convinced to provide money or gifts to the scammers or may be asked to conduct financial transactions on behalf of the scammers.

### C. *Cryptocurrency*

7. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Bitcoin is a type of cryptocurrency.

### Defendant FERNGREN's Participation in Scheme to Defraud

8. From at least 2016 through at least in or around April 2022, in the District of Minnesota, and elsewhere, the defendant,

**GAYLE JOYCE FERNGREN**,

together with other schemers, did knowingly and intentionally devise and participate in a scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of

3

material facts, and for the purpose of executing this scheme caused certain matters or things to be sent by the U.S. Postal Service and private delivery carrier.

9. The purpose of the scheme was to obtain money and property from parties throughout the United States through false and fraudulent pretenses, including fraudulently obtaining funds from individuals targeted by romance scams, obtaining funds from other individuals whose names and funds were fraudulently misappropriated, or fraudulently obtaining funds from state and federal agencies that administered Federal Pandemic Assistance Programs.

10. The scheme's participants routinely communicated with FERNGREN about money orders, checks, and debit cards that were sent to FERNGREN in Minnesota, or that were sent by FERNGREN to other locations, all in furtherance of the scheme to defraud other parties. FERNGREN also communicated with other scheme participants about financial activities, including the opening of bank accounts by FERNGREN, the receipt and deposit of funds into bank accounts FERNGREN controlled, the withdrawal of cash by FERNGREN, and the transfer of funds from FERNGREN's bank accounts to other parties, including parties who purported to be in such locations as Egypt and South Africa, all in furtherance of the scheme to defraud.

11. It was part of the scheme that persons unknown to the Grand Jury who participated in the scheme filed fraudulent claims with multiple states seeking UI benefits, such as from California's EDD and Nevada's DETR. Many of these claims were submitted in the names of other people without their knowledge or consent.

12. It was further part of the scheme that, under false pretenses, FERNGREN's co-schemers directed multiple state agencies, such as California's EDD and Nevada's DETR, to send via U.S. Mail, debit cards containing UI benefits to FERNGREN in Minnesota. For example, from approximately June 2020 through December 2020, FERNGREN received at least 68 debit cards containing approximately $1,370,030 in fraudulent UI benefits from the states of California and Nevada.

13. Also in furtherance of the scheme, on or about May 27, 2021, a scheme participant submitted an application in the name of FERNGREN seeking a PPP loan in the amount of approximately $20,833.00. Among other falsehoods, the PPP application claimed that FERNGREN had worked as an independent contractor doing residential remodeling since 2017. The PPP loan application also contained a bogus IRS Form 1040 Schedule C purporting to show that FERNGREN's residential remodeling business had gross receipts totaling $159,814 and a net profit of $42,263 for tax year 2020. Based on these fraudulent misrepresentations, the fraudulent PPP loan application was approved and approximately $20,833 in fraudulent PPP proceeds were deposited into FERNGREN's bank account in May 2021.

14. It was further part of the scheme that FERNGREN's co-schemers fraudulently induced romance fraud victims to send money to FERNGREN. For example, on or about March 30, 2022, FERNGREN deposited into a Bank of America account she controlled a check in the amount of $95,900 and a check in the amount of $97,500. At the direction of at least one other scheme participant, both of these

checks were mailed to FERNGREN in Minnesota by S.L. of Colorado, who was targeted by a romance scam. In other instances, FERNGREN's co-schemers misappropriated victims' personal information and funds without their knowledge and consent and then routed the funds to FERNGREN in Minnesota. For example, on or about April 23, 2022, FERNGREN received a check sent via U.S. Mail in the amount of $150,000 that purported to be drawn against a home equity line of credit in the names of A.B. and H.B. of Boca Raton, Florida, when, in fact, the check was drafted and mailed to FERNGREN without A.B. and H.B.'s knowledge or authorization.

15. It was part of the scheme to defraud that FERNGREN reached an agreement with at least one of her fellow scheme participants regarding the varying portion of fraudulently-obtained funds that FERNGREN could keep for herself.

16. FERNGREN knowingly participated in the scheme, despite her awareness that she and the scheme's other participants were engaged in illicit conduct. In or about April 2020, FERNGREN was notified by local law enforcement about the suspicious nature of her banking activities. Rather than cease her conduct, FERNGREN instead warned another scheme participant about the law enforcement inquiry and stated, "You need to call me as soon as possible. I received a phone call from the Edina police again regarding think bank."

17. Similarly, in or about April 2021, FERNGREN received a letter from the Minnesota Commerce Fraud Bureau stating, in part, "This letter is to provide notice that you, and/or persons you are associating with, may have engaged in fraudulent

activity," which may include "romance scams" and unlawfully "transmitting money via wires, ACH, mail, Western Union, MoneyGram." The letter further warned FERNGREN that "the goal of such scams is to obtain money from victims fraudulently," that it is "illegal to defraud people using the United States Postal Service (USPS), commercial interstate carriers (such as FedEx, UPS, or DHL)," and that "[u]sing or living off of the proceeds from fraudulent schemes may violate federal money laundering laws." Once again, rather than cease her conduct, FERNGREN instead provided the warning letter to another scheme participant.

18. In total, FERNGREN received at least $1.8 million in proceeds fraudulently obtained by other scheme participants from parties throughout the United States—including victim money from romance scams, victim money from the misappropriation of personal information, and funds from victimized state and federal agencies that administered Federal Pandemic Assistance Programs. After her receipt of these fraudulent proceeds, FERNGREN thereafter submitted most of the funds to other scheme participants, but routinely kept a portion for herself.

## COUNTS 1-4
(Mail Fraud)

19. Paragraphs 1 through 18 are incorporated by reference as if fully set forth herein.

20. On or about the dates set forth below, in the State and District of Minnesota and elsewhere, the defendant,

**GAYLE JOYCE FERNGREN**,

together with other co-schemers, as set forth below, for the purpose of executing the scheme described above, knowingly caused to be sent by the U.S. Postal Service and private delivery carrier certain matters or things, including the following:

| Count | Date of Mailing (on or about) | Mailing |
|---|---|---|
| 1 | July 24, 2020 | A mailing sent from Bank of America to FERNGREN in Rush City, Minnesota, containing a debit card in the name of victim K.L. containing approximately $16,973 in UI benefits from Nevada's DETR |
| 2 | July 24, 2020 | A mailing sent from Bank of America to FERNGREN in Rush City, Minnesota, containing a debit card in the name of victim E.U. containing approximately $16,973 in UI benefits from Nevada's DETR |
| 3 | March 29, 2022 | A UPS package sent from Colorado to FERNGREN in Rush City, Minnesota, containing checks from victim S.L. |
| 4 | April 28, 2022 | A mailing sent from Virginia to FERNGREN in Rush City, Minnesota, containing a check in the amount of $150,000 that purported to be drawn from an account in the names of victims A.B. and H.B. |

All in violation of Title 18, United States Code, Section 1341.

### Count 5
(Conspiracy to Commit Money Laundering)

21. Paragraphs 1 through 18 and Paragraph 20 are incorporated herein.

22. From at least in or about 2016 through in or about April 2022, in the State and District of Minnesota, and elsewhere, the defendant,

**GAYLE JOYCE FERNGREN**,

did knowingly combine, conspire, and agree with other persons, known and unknown to the Grand Jury, to commit offenses against the United States, in violation of Title 18, United States Code, Section 1956, that is:

8

a. to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specific unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, Title 18, United States Code, Section 1343, and knowing that the transactions were designed, in whole and in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b. knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer funds from a place in the United States to a place outside the United States, knowing that the funds involved in the financial transactions represented the proceeds of some form of unlawful activity and knowing that such transportation was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, that is, mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, Title 18, United States Code, Section 1343, and, in violation of Title 18 U.S.C. United States Code, Section 1956(a)(2)(B)(i).

## Purpose and Object of the Conspiracy

23. The purpose and object of the conspiracy was to conceal, hide, and launder fraudulent proceeds, including funds obtained through false and fraudulent

9

pretenses by individuals targeted by romance scams, funds obtained from other individuals whose names and funds were fraudulently misappropriated, or from funds fraudulently obtained from state and federal agencies that administered Federal Pandemic Assistance Programs.

### Manner and Means of the Conspiracy

24. The conspirators used the following manner and means, among others, to accomplish the objects and purpose of the conspiracy:

   a. FERNGREN's co-conspirators, through false and fraudulent pretenses, representations, and promises, and concealment of material facts, persuaded victims to submit funds, which were then routed into financial accounts controlled by FERNGREN.

   b. At times, FERNGREN's co-conspirators fraudulently induced victims to send funds from romance scams, schemes to defraud Federal Pandemic Assistance Programs, or other fraudulent schemes to designated mailing addresses, including to mailing addresses in Minnesota controlled by FERNGREN.

   c. FERNGREN reached agreements with at least one of her co-conspirators regarding the portion of fraudulently-obtained funds that FERNGREN would receive for her laundering of proceeds for other conspirators.

   d. FERNGREN and her co-conspirators opened bank accounts specifically to launder funds. FERNGREN and her co-conspirators transferred these funds to different accounts promptly upon receipt in attempts to avoid bank and law enforcement scrutiny.

10

   e. At times, a co-conspirator directed FERNGREN to open certain accounts or to make certain financial transactions using fraudulently obtained funds.

   f. FERNGREN received the funds obtained from romance scams, from schemes to defraud Federal Pandemic Assistance Programs, or from other fraudulent schemes, which she routinely converted either for her own use, into money orders or cash via ATM and bank withdrawals, or into Bitcoin and other cryptocurrencies, which FERNGREN transferred to cryptocurrency accounts controlled by foreign co-conspirators.

  25. As part of the conspiracy, after FERNGREN received approximately 68 pre-loaded debit cards containing fraudulent UI benefits, FERNGREN and other conspirators thereafter withdrew fraud proceeds at ATM locations, including ATMs located in or near Rush City, Minnesota. For example, between on or about June 11, 2020, and on or about October 15, 2020, FERNGREN and other conspirators withdrew a total of approximately $680,922.50 in cash via approximately 719 separate ATM cash withdrawals.

  26. In addition to cash withdrawals, FERNGREN converted UI benefits into money orders. For example, on or about September 17, 2020, FERNGREN used a California EDD debit card with UI in the name of victim W.U. to make a purchase of approximately $2,900 at a Walmart in Pine City, Minnesota. On or about September 19, 2020, FERNGREN used a California EDD debit card in the name of apparent claimant S.S. to make another purchase of approximately $2,900 at a Walmart in Pine City, Minnesota. On or about September 20, 2020, FERNGREN used a

California EDD debit card in the name of victim S.S. to make an additional purchase of approximately $2,902.64 at a Walmart in Blaine, Minnesota. Later, in or about September 2020, FERNGREN used the California EDD debit cards in the names of victims W.U. and S.S. to purchase multiple MoneyGram money orders totaling approximately $8,700.

27. As part of the conspiracy, between approximately June 8, 2020, and approximately July 1, 2021, FERNGREN and Co-Conspirator 1 purchased approximately 52 additional MoneyGram money orders amounting to approximately $48,250. FERNGREN and Co-Conspirator 1 purchased some of the money orders at Walmart using Green Dot cards that were loaded with fraudulent UI funds issued in the names of different purported UI claimants by such states as Illinois, New York, and Ohio.

28. Between May 2020 and February 2022, FERNGREN and Co-Conspirator 1 also purchased approximately $900,625 in Bitcoin at cryptocurrency ATMs in Minnesota using cash obtained from the fraudulent UI cards that had been mailed to FERNGREN in Minnesota.

29. More specifically, on or about June 16, 2020, FERNGREN opened an account with Coinsource, a business that facilitated the sale of the cryptocurrency Bitcoin, in exchange for U.S. Dollars. Thereafter, from on or about June 18, 2020, through on or about September 25, 2020, FERNGREN together with Co-Conspirator 1 collectively inserted approximately $434,410 in cash into Coinsource ATMs to purchase Bitcoin at multiple locations in Minneapolis and St. Paul, Minnesota.

Thereafter, of the approximately $434,410 worth of Bitcoin that FERNGREN and Co-Conspirator 1 purchased via Coinsource, they transferred approximately $336,391 to combined cryptocurrency accounts controlled by at least two co-conspirators located overseas.

30.   FERNGREN and Co-Conspirator 1 also held accounts at other cryptocurrency businesses, such as Coin Cloud and CoinFlip. Between on or about October 8, 2020, through on or about February 6, 2021, FERNGREN together with Co-Conspirator 1 purchased another $95,180 in Bitcoin through Coin Cloud. Between on or about September 23, 2020, through on or about February 9, 2022, FERNGREN together with Co-Conspirator 1 purchased approximately $365,075 in Bitcoin.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

31.   Counts 1 through 5 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c), and pursuant to Title 18, United States Code, Section 982(a)(1).

32.   If convicted of any of Counts 1 through 4 of this Indictment, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to Counts 1 through 4 of the Indictment.

33. If convicted of Count 5 of this Indictment, the defendant shall also forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1956, and any property traceable to such property.

34. If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p) as incorporated by Title 18, United States Code, Section 982(b)(1) and Title 28, United States Code, Section 2461(c).

A TRUE BILL

_____     _____
UNITED STATES ATTORNEY                    FOREPERSON